# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 773 | **DATE** | 3/21/2000 |
| **CASE TITLE** | Thomas J. Moriarty, et al vs. Hills Funeral Home | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. There is no genuine issue of material fact as to Moriarty's claims against either Hills of Pepper, and Moriarty is entitled to judgment as to liability as a matter of law against each of them. (81-1) The amount of that joint ans several judgment will be determined through further submissions in accordance with this opinion. Hills' cross-motion for summary judgment is denied. (74-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | | | |
| ✓ | Notices mailed by judge's staff. | | | MAR 2 1 2000 | | 89 |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | docketing deputy initials | | |
| | Mail AO 450 form. | | | 3/21/2000 | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | | |
| SN | courtroom deputy's initials | | | SN | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | | |

THOMAS J. MORIARTY, Trustee, on )
behalf of the TRUSTEES OF THE )
LOCAL UNION NO. 727 I.B.T. PENSION )
TRUST and TRUSTEES OF THE )
TEAMSTERS LOCAL UNION NO. 727 )
HEALTH AND WELFARE TRUST, )
)
Plaintiff, )
)
v. ) No. 98 C 773
)
HILLS FUNERAL HOME, LTD., et al., )
)
Defendants. )

DOCKETED
MAR 2 7 2000

## MEMORANDUM OPINION AND ORDER

Thomas J. Moriarty as Trustee ("Moriarty") has sued two

defendants on behalf of the Local Union No. 727 Pension Trust and

the Teamsters Local Union No. 727 Health and Welfare Trust

(collectively "Funds") pursuant to the Labor Management Relations

Act (29 U.S.C. §185) and the Employee Retirement Income Security

Act of 1974 ("ERISA," 29 U.S.C. §1132(a)(3)), seeking to recover

employer contributions allegedly owed to Funds. Moriarty and

defendant Hills Funeral Home, Ltd. ("Hills") have filed cross-

motions for summary judgment as to liability pursuant to Fed. R.

Civ. P. ("Rule") 56. Moriarty has also filed a Rule 56 motion as

to liability on his claims against defendant George Pepper

("Pepper").

In compliance with this District Court's LR 56.1, adopted to implement Rule 56 by facilitating the identification of the presence or absence of genuine issues of material fact, the litigants have filed the factual statements and responses called for by that LR.[1] They have also completed the required briefing on the motion and cross-motions. For the reasons set forth in this memorandum opinion and order, both of Moriarty's motions are granted, while Hills' motion is denied.

### Summary Judgment Principles

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not

---

[1] Because resolution of Moriarty's Rule 56 motion against Pepper requires the adoption of a perspective crediting the latter's version of any disputed facts (if supported by evidence), this opinion most frequently cites to "Pepper Stmt. ¶--." For the same reason in connection with Moriarty's ultimate success on the Moriarty-Hills cross-motions, there are relevant citations to "Hills Stmt. ¶--." Where Pepper or Hills has failed to respond to Moriarty's version (so that the latter is deemed admitted pursuant to LR 56.1(b)(3)(B)), or where the Moriarty version controls for any other reason, that version will be cited "Moriarty Stmt. ¶--." Finally, because Pepper did not respond to any of the factual assertions in Moriarty Stmt. ¶¶129-92, this opinion cites only to the Hills Stmt. as to those paragraphs.

required to draw unreasonable inferences from the evidence" (<u>St. Louis N. Joint Venture v. P & L Enters., Inc.</u>, 116 F.3d 262, 265 n.2 (7th Cir. 1997)). Where as in the Moriarty-Hills duel cross-motions for summary judgment are involved, it is necessary to adopt a dual perspective--one that this Court has often described as Janus-like--that sometimes involves the denial of both motions. That has not occurred here, because even from a pro-Hills perspective Moriarty's Rule 56 motion succeeds.

<u>Facts</u>

<u>Pepper's Funeral Home Operation</u>

Funds are employee benefit plans that are third-party beneficiaries of collective bargaining agreements ("CBAs") entered into between the Funeral Directors Services Association of Greater Chicago ("Association") and the Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants Union, Local No. 727, I.B.T. ("Union")(Pepper Stmt. ¶¶28, 31). Moriarty is a trustee of both Funds (<u>id.</u> ¶30).

Association is a multi-employer organization of funeral homes located in the Chicago metropolitan area (<u>id.</u> ¶40). Among other things, it negotiates labor agreements for its members and

3

also provides them with a pre-need funeral arrangement trust fund and continuing education programs (id. ¶¶43-44). Association communicates with its members through a monthly newsletter (id. ¶45) that provides members with a variety of information, including information about labor relations (id. ¶46). Approximately 80% of the newsletters contain information about Association's relationship with Union (id. ¶50).

Pepper operated a funeral home business in Palos Hills, Illinois from approximately February 1979 to January 1998 (id. ¶¶32-35). From 1979-82 Pepper operated his business under the name Olympic Hill Chapel (id. ¶33). Then from 1982-98 Pepper operated his business as Hills Funeral Home (id. ¶¶33-34).[2]

In December 1978 Moriarty had sent Pepper an application for membership in Association in connection with his contemplated acquisition of the funeral home business (id. ¶54). Pepper signed and returned the application, which stated in part (id. ¶¶55-56):

> [I] agree[], if elected to membership, to abide by and be bound by the provisions of the Constitution, By-Laws, Rules and Regulations of the Association.

---

[2]   Because Pepper operated as a sole proprietor using the Hills name, this opinion's references to him by his own name while speaking of the acquiring corporation as "Hills" should cause no confusion.

One of the then-existing provisions of Association's Constitution

(its Art. X, §2) read (id. ¶59):

> **Labor Negotiations.** The Association, through action by
> the General Executive Board, shall authorize the
> President to appoint a committee to represent the
> members of the Association in labor negotiations or any
> dispute or grievance which may arise from such labor
> negotiations and to enter into such agreements as a
> result of the negotiations, subject to the approval of
> the membership.

In February 1979 Pepper was elected to Association membership

(id. ¶57).

Association negotiates CBAs with Union through a negotiating

committee (id. ¶70). Those CBAs require Association members to

whom they apply "to contribute to the Funds for work performed by

bargaining-unit employees, including amounts per month for each

funeral director and embalmer and driver" (id. ¶67; Moriarty

Stmt. ¶67). Association does not require its members to delegate

on an individualized basis such authority for Association to

bargain or to ratify negotiated contracts--instead, consistently

with the Association Constitution, Association's members as a

body ratify the contracts at special membership meetings (Pepper

Stmt. ¶¶74, 77). As an Association member, Pepper was

consistently notified of those special membership meetings, but

he chose not to attend them (id. ¶¶78-80).

After a CBA is approved, Association distributes a copy of the contract to each member with a cover letter that says "[t]he Agreement applies to every member of the Association" (id. ¶82). Pepper received copies of the approved CBAs and the cover letters from Association (id. ¶83). In addition he received copies of Association's monthly newsletters, but he did not read them (Moriarty Stmt. Ex. O, Pepper Dep. 70).

Four people worked for Pepper at Hills Funeral Home: Greg Peppas, Peter Talso, Jovita Simmermon and John Schultz (Moriarty Stmt. ¶176). Those employees performed covered bargaining unit work as defined by the CBAs (Pepper Stmt. ¶69). Pepper did not have a health or pension plan for any of them (id. ¶92).

In January 1998 Pepper submitted his resignation to Association (id. ¶64), and on February 18, 1998 it approved his resignation (id. ¶65). At no time before that date had Pepper told Association that it was not authorized to bargain on his behalf, nor did he tell Union that Association was not authorized to do so (id. ¶¶90-91).

Funds' Audit of Pepper's Funeral Home

On July 25, 1997 Funds' auditor, Thomas Havey LLP, notified Pepper that Funds wanted to conduct an audit of the Hills Funeral Home payroll records (id. ¶122). On August 14, 1997 Havey

6

conducted the audit covering the period from January 1, 1990 through June 30, 1997 (id. ¶124). On October 22, 1997 Havey issued his audit report, which found that Pepper owed $38,575.53 to the Pension Fund and $65,780.24 to the Health and Welfare Fund in contributions, interest, liquidated damages and audit fees (id. ¶127). Pepper received a copy of Havey's report between October 22 and November 5, 1997 (id. ¶128).

## Sale of the Hills Funeral Home Assets

Meanwhile, in the summer of 1997 Pepper decided to sell his business, and he retained lawyer Frank Daly ("Daly") to assist him with that process (Hills Stmt. ¶129). Sometime during that summer Pepper told Daly that Funds wanted to audit his records (Moriarty Stmt. ¶130).[3] Pepper also told Daly, when the audit was completed, that Funds were claiming a "debt" in a dollar amount not yet determined (id. ¶134).[4]

In September 1997 Pepper began discussing with Jason ("Jason") and Frank ("Frank") Leonard (collectively "Leonards")

---

[3] Hills purports to deny that, citing to Pepper's deposition testimony. But in the cited testimony Pepper says that he never gave the audit report to Daly, not that he never told Daly about the audit (see Moriarty Stmt Ex. O, Pepper Dep. 94-95). Hills' attempted denial thus fails.

[4] What was said in the preceding footnote applies here as well.

the possibility of Leonards' buying the assets of Pepper's business (Hills Stmt. ¶135). Both Frank and Jason are Union-registered trade embalmers and funeral directors (id. ¶¶105-06, 109-10). Frank owns the Bukauskas-Leonard Funeral Home, which has been an Association member since 1988 (id. ¶¶94-95). Bukauskas-Leonard Funeral Home pays contributions to the Health and Welfare Trust and to the Teamsters Local Union No. 727 Legal Assistance Fund on behalf of both Leonards pursuant to remittance forms received by the funeral home (id. ¶112).

Pepper was represented in the asset sale by Daly (id. ¶136), while Leonards were represented by James Carroll ("Carroll") (id.). During the negotiations Daly told Carroll that a "Union audit" was in progress (id. ¶137; Moriarty Stmt. Ex. T, Carroll Dep. 10-11, 53-54). Though they did not specifically discuss any potential audit liability, Carroll and Daly agreed that Leonards would not assume any of Pepper's liabilities (Hills Stmt. ¶¶144-46). After exchanging a number of drafts, Carroll and Daly completed the Contract for Sale of Real Estate and Asset Purchase Agreement ("Agreement," Hills Stmt. Ex. E), which included this provision (id. ¶27(A)(c)):

> Seller is not a party to any collective bargaining agreements. Seller represents and warrants that no sums are due any Union as the result of the Seller's

business operations.

Pepper and Leonards signed the Agreement on November 5, 1997, with the closing set for January 1998 (Hills Stmt. ¶¶164, 166). On December 29, 1997 Carroll called Leonards to discuss the closing and told them that the "union wants $100,000 from Pepper" (Moriarty Stmt. ¶169).[5] On January 28, 1998 the sale closed, and Hills Funeral Home became Hills Funeral Home, Ltd. (Hills Stmt. ¶171).

## Moriarty-Hills Cross-Motions

Generally when one corporation purchases the assets of another, the buyer does not assume the liabilities of the seller (Upholsters' Int'l Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323, 1325 (7th Cir. 1990)). But the courts have recognized a number of exceptions to that general rule, one being known as the "successorship doctrine." Under that concept courts will impose liability for unpaid contributions to ERISA

---

[5] Hills attempts to deny this fact by citing to the same deposition testimony that Moriarty claims supports it. Moriarty is right. Leonards received a bill from Carroll that contains this entry for December 29, 1997: "[C]all Jason & Frank re: closing 1/7 - union wants $100,000 from Pepper" (Moriarty Stmt. Ex. T, Carroll Dep. Ex. 9). When Carroll was asked whether that entry indicated he told Leonards that Union wanted $100,000 from Pepper, he replied: "That's what the entry appears to relate, yes" (Carroll Dep. 77-78).

plans on successor corporations if "there [are] sufficient
indicia of continuity between the two companies and...the
successor firm had notice of its predecessor's liability" (id. at
1329). Continuity is present if "no major changes are made in
[the business] operation" (EEOC v. G-K-G Inc., 39 F.3d 740, 748
(7th Cir. 1994); Artistic Furniture, 920 F.2d at 1329 (continuity
was established by evidence that the successor employed most of
the predecessor's personnel, used the predecessor's plant,
equipment and machinery, completed the predecessor's work orders
and honored warranty claims on the predecessor's products)).  As
Artistic Furniture, id. put it:

> Notice can be proven...by pointing to facts that
> conclusively demonstrate actual knowledge, [or] by
> presenting evidence that allows the fact finder to
> imply knowledge from the circumstances.

And Moriarty himself has even more recently been successful in
reconfirming that the same two-element test remains good law in
this Circuit (Moriarty v. Svec, 164 F.3d 323, 327-29 (7th Cir.
1998)).  Both of those elements are present in this case as well.

Even viewed most favorably to Hills, the undisputed facts
establish that there was a continuity of business operations
between Pepper's funeral home and Hills.  Like its predecessor,
Hills provides services typical of the funeral home industry

10

(Hills Stmt. ¶¶34, 39).  Hills uses the building, telephone number, equipment, furniture and supplies of its predecessor in the operation of its business--indeed, it expressly bought the name "Hills Funeral Home" from Pepper (id. ¶¶165, 172-75).  Two of the four people who worked for Pepper now work for Hills (id. ¶¶176-77).  Finally, Hills now controls the pre-need funeral arrangement trusts that had been held for its predecessor by Association (id. ¶180).  Because the undisputed facts establish that no major change in the business occurred when Hills Funeral Home became Hills Funeral Home Ltd., it cannot be denied that the continuity element is satisfied.

That conclusion is unaltered by the fact that Pepper himself has no involvement in Hills.  On that score the question is not, as Hills seems to believe, whether it is the alter ego of Hills Funeral Home, but instead whether there is continuity in the two business operations.  And the unqualified affirmative answer to that question is unaffected by Pepper's absence, which was virtually the only difference between the operation of Hills Funeral Home Ltd. and that of Hills Funeral Home.

Even with the required reasonable inferences in Hills' favor, the record also plainly demonstrates that Leonards had notice of Funds' claim.  Though the  Leonards say that Pepper did

11

not tell them money was owed to Funds, they do not assert ignorance, of Funds' claim (Hills Stmt. ¶¶11, 21; id. Ex. J, Frank's Aff. ¶4; id. Ex. K, Jason's Aff. ¶4). Indeed, they cannot legitimately claim ignorance because their attorney Carroll admits that he learned of the audit of Peppers' obligations during the contract negotiations (although he labels that as a Union audit--more on this subject later), and he further acknowledges that he told Leonards the "union wants $100,000 from Pepper" at the end of December 1997 (Hills Stmt. ¶137; Moriarty Stmt. Ex. T, Carroll Dep. 10-11, 53-54; Moriarty Stmt. ¶169). So Leonards had been told by their lawyer, a full month before the asset sale closed, that "the union" was asserting a claim against Pepper.

To be sure, as Hills points out, Carroll's statement to Reynolds had referred to "the union," rather than more accurately speaking in terms of a claim by "Funds." But it is totally unsurprising to find people engaging in such colloquial usage that makes no distinction between (1) the unions that enter into CBAs that require contributions to employee benefit funds and (2) those funds themselves, even though the law specifically requires the funds' independence from the unions. In this Court's experience, lawyers (who should know better) regularly

blur that line by referring to the employer's obligation to "the union" and not to the fund entities.

Here it is unnecessary to rely (inappropriately) on surmise in that respect, for the record expressly reveals that Leonards themselves did not differentiate between Union and Funds in that respect. Both Frank and Jason were Union members who made contributions to the Health and Welfare Fund and the Legal Assistance Fund (Hills Stmt. ¶¶107, 110, 112). Frank testified that his contributions to the Health and Welfare Fund were to the "union" for "hospitalization" (id. ¶190), and Jason similarly testified that his contributions to the Health and Welfare Fund were "premium[s] for health insurance...to the union" (id. ¶192). Further, shortly before the sale closed Jason told Carroll he was concerned that "the union" would come after Hills because the Bukauskas-Leonard Funeral Home was part of Association (id. ¶170). In short, the colloquial usage of owing money "to the union," when what is meant more precisely is owing those monies for employee benefit plan premiums (and hence to Funds), is 100% in sync with Leonards' own usage. And Hills has adduced no facts from which it can even be inferred that Leonards differentiated between Union and Funds in such usage. Hence their admitted knowledge that "the union wants $100,000 from Pepper" plainly

13

satisfies the notice requirement of the successorship doctrine.[6]

To summarize, Hills has not raised a fact issue for trial, either as to the continuity of business operations as between itself and Pepper's sole proprietorship or as to Leonards' being on express notice of Funds' claim prior to the sale. In consequence, Hills is a successor to Pepper's funeral home business as a matter of law and, as such, it is also liable under ERISA for any employer contributions that Pepper owes to Funds.

### Moriarty's Motion Against Pepper

Pepper's membership in Association is not of itself sufficient to bind him to the CBAs (<u>Moriarty v. Glueckert Funeral Home, Ltd.</u>, 155 F.3d 859, 866-67 (7th Cir. 1998)). Rather, Pepper is bound to those agreements only if he manifested an "unequivocal intention to be bound by group action in collective bargaining" (<u>id.</u> at 865, quoting the approach adopted, and the

---

[6] Indeed, the contrary argument advanced by Hills' counsel is really disingenuous, even apart from the evidence of Leonards' own use of language. For over a half century the law has forbidden any payments of "money or other thing of value" by any employer to any labor organization with only limited exceptions (trust fund obligations of the type at issue here and union dues checkoffs being the most noteworthy exceptions), under pain of criminal responsibility for any violation (29 U.S.C. §186). What then is Hills contending that "the union" wanted the $100,000 from Pepper for--an unpaid union dues checkoff for Pepper's few employees? Like Pepper (as discussed in the next section), Hills cannot play ostrich to escape liability.

language quoted in turn, by <u>Trustees of the UIU Health & Welfare</u> <u>Fund v. New York Flame Proofing Co.</u>, 828 F.2d 79, 83 (2d Cir. 1987)).

Caselaw provides examples of employers who do manifest their intention in such unequivocal terms. Thus in <u>International Union</u> <u>of Operating Eng'rs, Local 150 v. G. Bliudzius Contractors, Inc.</u>, 730 F.2d 1093 (7th Cir. 1984) the employer signed a membership application stating that "by virtue of membership in good standing in the Builders' Association of Chicago (a not-for-profit corporation) this company/corporation, has with all other members of the Association, delegated and assigned to the Association certain of its rights to bargain collectively with labor organizations," and that it "agrees to be governed by and abides by the provisions of the Constitution and By-Laws of the Builders' Association of Chicago...." In turn those By-Laws deemed each member "to have designated the Association as the exclusive bargaining representative for the purpose of negotiating collective bargaining agreements" (<u>id.</u> at 1094-95 & n.1). Moriarty argues that Pepper, like the employer in <u>Bliudzius</u>, expressly indicated his intent to be bound by the CBAs when he applied for membership in Association.

Again Moriarty is right. It will be recalled that the

15

Association membership application signed by Pepper expressly said that he "agrees, if elected to membership, to abide by and be bound by the provisions of the Constitution, By-laws, Rules and Regulations of the Association" (Pepper Stmt. ¶56).[7] And it will also be recalled that the relevant portion of Association's Constitution in effect at the time expressly provided (id. ¶59):

> **Labor Negotiations.** The Association, through action by the General Executive Board, shall authorize the President to appoint a committee to represent the members of the Association in labor negotiations or any dispute or grievance which may arise from such labor negotiations and to enter into such agreements as a result of the negotiations, subject to the approval of the membership.

As in Bliudzius, that provision was an express delegation of bargaining authority that bound Pepper to the CBAs. And no communication that ensued between Pepper and Association during the nearly two decades of Pepper's Association membership ever changed that original bargain--quite the contrary, the record is rife with repeated communications over the years in which Association regularly reported to its membership (including Pepper) on the collective bargaining process and the resulting

---

[7]   That relevant language appears on the second page of the application, which was inadvertently omitted from the materials provided in conjunction with the motions. But the omission is not fatal, because Pepper has admitted that the application language is as stated by Moriarty.

CBAs.

That is the critical factor that distinguishes this case from <u>Glueckert</u>, where owner Glueckert's Association membership application had read the same way as here, but where Association's Constitution was then totally silent as to the subjects of representing the Association membership in collective bargaining and of binding the members to CBAs subject to membership approval. In 1981, <u>after</u> Pepper had joined Association with the quoted Constitution language in effect but <u>before</u> Glueckert later joined Association, that quoted language was moved <u>out</u> of Association's Constitution and into Association's separate Official Statements of Policy (see <u>Glueckert</u>, 155 F.3d at 863 & n.12).[8] With that being the case, our Court of Appeals found in <u>Glueckert</u> that the required "unequivocal intention to be bound" had not been manifested by the group of inferential factors that this Court (967 F.Supp. 1038 (N.D. Ill. 1997)) had considered sufficient in that case. By total contrast, Pepper's <u>express</u> contractual undertaking to abide by and be bound by Association's Constitution, coupled with

---

[8] Unlike Association's Constitution, such Official Statements of Policy were not listed in the membership application among the documents whose provisions the applicant "agrees...to abide by and be bound by...."

17

the Constitution's then-existing _express_ provisions authorizing CBAs to be negotiated and entered into by Association (subject to approval by the membership generally, which was obtained in every instance), created a contract that satisfied the "unequivocal intention to be bound" test--and Pepper cannot escape that result by his ostrichlike head-in-the-sand arguments discussed hereafter.

Pepper claims that he did not receive from Moriarty either Association's Constitution or copies of the CBAs in effect when he was elected to membership in 1979 (_id._ ¶58). Even assuming that to be true, it does not matter. Pepper joined Association and thereafter enjoyed the benefits of its membership--group health insurance, vehicle insurance, the pre-need trust program, the certified copy service and the continuing education seminars--for nearly 20 years (_id._ ¶¶57, 63, 65). He cannot escape the consequence of Association membership to which he had expressly agreed--the CBA commitment--just because he never bothered to read the governing documents by which he pledged to abide (see, e.g., _Bliudzius_, 730 F.2d at 1095 n.3, holding that the employer "had a responsibility to read the By-Laws" that it had agreed to observe, even though the Association there had not provided them to the employer).

Even a criminal defendant cannot escape responsibility by averting his or her eyes to the reality of what has expressly been called to his or her attention (see the so-called "ostrich" instruction as to what constitutes "knowledge," embodied in the even more demanding criminal law context by Instruction 4.06 of the Federal Criminal Jury Instructions of the Seventh Circuit (1998)). Civil litigants such as Pepper can fare no better: He is not absolved of obligations that he freely undertook, simply because he then chose to ignore them.

In sum, Pepper is bound by the CBAs and is liable to Funds for unpaid contributions. And as held earlier, Hills is Pepper's successor as a matter of law and, as such, is also liable.[9] Because the amount for which defendants are jointly and severally liable must still be determined, Moriarty is ordered to submit appropriate proof of each element of his damage claim on or before March 31, 2000. Hills and Pepper are then ordered to respond to Moriarty's submission on or before April 14, 2000.

---

[9] Because Agreement ¶27(A)(c) contains Pepper's warranty against obligations due to "any Union," and Agreement ¶27(B) provides for indemnification by Pepper against any breach of warranty, there is a question as between Pepper and Hills as to whether he must indemnify it against his liability to Funds, for which this opinion has found responsibility on Hills' part as well. That issue was not posed by the current Rule 56 motions.

## Conclusion

There is no genuine issue of material fact as to Moriarty's claims against either Hills or Pepper, and Moriarty is entitled to judgment as to liability as a matter of law against each of them. As indicated in the preceding paragraph, the amount of that joint and several judgment will be determined through further submissions in accordance with this opinion. Hills' cross-motion for summary judgment is denied.

Milton I. Shadur
Senior United States District Judge

Date:   March 21, 2000